GEORGE A. BAHNEMANN, Respondent, v. ADOLPH A. LEH-MANN, Lillian Lehmann, Paul Lehmann and R. S. Brookings, Appellants.

(193 N. W. 477.)

Depositions — improper to take, return and submit in evidence deposition after trial and filing of briefs without order of court or consent of other party.

1. After a trial has occurred and briefs have been filed, it is irregular and improper for one party, upon his own notice and without action of the court or consent of the other party to take, return, and submit in evidence, a deposition.

Mortgages — evidence held sufficient to sustain judgment for plaintiff in foreclosure of mortgage.

2. Where defendant, after conviction of murder and while pending an appeal, repurchased certain farm personalty from his brother-in-law, the plaintiff, and, with his wife, executed notes and mortgages for an expressed consideration of $24,300, and where, thereafter, in an action to enforce the notes, and foreclose the mortgages, defendant, being an escaped convict, and his wife, through an attorney, assert through answer and evidence that the transaction was affected with fraud, duress, and undue influence, was usurious, and for a real consideration of $14,300 only, it is held, for reasons stated in the opinion, that the findings and judgment of the trial court in plaintiff's favor are sustained by the evidence.

Opinion filed April 21, 1923.

Depositions, 18 C. J. § 73 p. 634 n. 39; Mortgages, 27 Cyc. p. 1132 n. 47.

In District Court, Stark County, *Pugh, J.*

Action to foreclose realty and personalty mortgages.

Defendants have appealed from a judgment on foreclosure.

Affirmed.

*T. D. Casey,* for appellants.

Every deposition intended to be read in evidence on the trial must be filed at least one day before the trial. Comp. Laws, 1913, § 7905.

Exceptions to a deposition on the ground of incompetency or irrelevancy may be made at the time the same is offered in evidence; other exceptions to deposition must be made in writing, specifying the grounds of objections and filed in the cause before the commencement of the trial. Comp. Laws, 1913, § 7906.

While the time to object to the admissibility of a deposition in evidence may depend upon the nature of the objection urged and the opportunity for previous objection, and is usually regulated by statutes or rules of court, it may be stated as a general rule that objection should always be taken at the earliest opportunity. 18 C. J. 754, § 381.

When the relationship of a certain character is shown, or the circumstances of weakness, necessity, or distress are proved, equity will regard the agreement as procured by undue influence. 13 C. J. 405, § 330.

The plaintiff must show that the transaction was had in the most perfect good faith on his part, and was equitable and just between the parties, or as some of the authorities say, that it was beneficial to the other party. Thomas v. Whitney, 57 N. E. 808; Shevlin v. Shevlin, 105 N. W. 257; Peckham v. Van Bergen, 10 N. D. 43.

We confess our inability to say that we are positive that these things are so; but the probability is overwhelming we think that, if there ever was a case where the parties should be relegated to their original positions and made to deal with each other under the broad principles of equity, this is the case. Dibert v. Peterson, 145 Pac. 589; Brummond v. Krause, 8 N. D. 573.

Standing alone (consideration) it is not evidence of fraud or undue influence; but where the party was under the influence of another and was not a free agent, the fact that the consideration was inadequate is a material element in determining a court of equity to set the contract aside. 13 C. J. 410, § 338.

The surety who executes a note and mortgage to secure the payment

of the price is the person most injured by the vendor's fraud and may sue for cancelation of the note and mortgage. 9 C. J. 1227, § 130.

All that is required to establish a case of usury is a fair preponderance of the evidence, and there is no shift or device on the part of the lender to evade the statute under or behind which the law will not look to ascertain the real nature of the transaction. Phelps v. Montgomery, 60 Minn. 303, 62 N. W. 260; France v. Munro (Iowa) 115 N. W. 577; Drinkall v. State Bank, 11 N. D. 10; Brown v. Skotland, 12 N. D. 445; 39 Cyc. 958, 1054.

A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Putnam v. Prouty, 24 N. D. 517.

Since the borrower under a usurious loan is considered to have been forced against his will into the transaction by the oppressive conduct of the lender, the borrower is regarded as not in pari delicto with the lender, and therefore, so long as any part of the usurious debt remains unpaid, he may set up usury as a defense in an action brought by the lender to enforce payment of the debt. 39 Cyc. 1018.

The statutes of usury bind courts of equity as well as those of law. The usurer seeking the aid of a court of equity will be given only such relief as is consistent with the statute. 39 Cyc. 1016.

Courts of equity will not ordinarily require the defense of usury to be set forth with such particularity in the answer as in special pleas either at law or in equity. This is especially true when usury is pleaded for the purpose of avoiding a deed, or other collateral purpose. In such case the bare fact of usury only is material, while in actions for money the extent and character of the alleged usury are of the first importance. 39 Cyc. 1045.

*T. F. Murtha* (*Sullivan, Hanley,* and *Sullivan,* of counsel), for respondent.

Before a mortgage which is valid and regular upon its face can be set aside by a court of equity for the reason that its execution was obtained by fraud and duress, there must be clear and convincing proof of such facts. Englert v. Dale, 25 N. D. 587.

## Statement.

BRONSON, Ch. J. This is an action to foreclose both realty and per-

sonalty mortgages. Defendants have appealed from a judgment of fore-
closure and have demanded a trial de novo.

The facts are: In 1917 Adolph Lehmann, a single man then aged
thirty-one years, was possessed of some 800 acres of land in Stark
county. There he was engaged in farming, cattle and sheep raising.
He had considerable stock and machinery. On May 20th, 1917, he
killed one Wetzstein. On May 22nd, 1917, he gave a mortgage upon
his land to his counsel for $3,500. He was arrested and confined in
jail. While there, on June 8th, 1917, he gave to plaintiff a bill of sale
covering his horses, cattle, sheep, machinery, and household furniture
situated on his farm, for a consideration of $9,000; also, a lease of the
land from June 8th, 1917, to December 31st, 1919, for a consideration
of $1,000; $500 payable immediately and $500 in November, 1918.
The plaintiff is the brother-in-law of Adolph. Plaintiff's mother mar-
ried Adolph's father. Plaintiff paid the consideration of $9,500 and
took possession of the property. Later, in September, 1917, bail was
fixed for Adolph at $20,000. His brother and plaintiff became his
bondsmen. Adolph gave to them a mortgage upon the land to secure
$20,000. Adolph was released from custody. Adolph went to Beach,
North Dakota, and lived there most of the winter following. In Jan-
uary, 1918, after trial he was convicted of murder in the second degree
and sentenced to serve twenty years in the penitentiary. After the trial
he went to his farm where plaintiff was living and remained there a
month or so. Plaintiff and Adolph had negotiations concerning the
return or resale of the personal property so sold and concerning the
cancelation of the lease. Adolph contemplated a period of about two
years during which he might remain without the penitentiary, go back
upon his farm, and rehabilitate his property interests. On March 18th,
1918, Adolph married his present wife whom he had met while
at Beach. On March 25th, 1918, Adolph and plaintiff signed
a written agreement for sale of the personal property upon the farm in-
cluding a threshing machine; also the cancelation of the lease, for a
total consideration of $24,000 to be secured by a mortgage upon the
land and all personal property. Plaintiff therein agreed to assume the
mortgage of $3,500 to Adolph's counsel and a mortgage of $1,200
against the land. This agreement provided for execution of the papers
on March 30th, 1918. On that day in a bank at Richardton, North

Dakota, Adolph and his wife made ten promissory notes aggregating $24,430 payable, respectively, $1,430 and $3,000, on July 1st and November 1st, 1918; and $3,000 and $1,000, respectively, on July 1st and November 1st, 1919, 1920, 1921, and 1922. They made also a realty mortgage upon the land and a chattel mortgage upon the personalty to secure the same. On the same date they also made to plaintiff and Adolph's brother another mortgage upon this land to secure $20,000, the amount of plaintiff's bond for his freedom during the course of an appeal to the supreme court. After these papers were executed, plaintiff and his wife took possession of the farm and personalty; there they lived throughout the summer and in 1919. Plaintiff paid the mortgage to Adolph's counsel and the $1,200 mortgage upon the land. For a time and until about May 11th, 1918, he remained on this farm where Adolph and his wife were. Later he went to California. The notes that fell due in 1918 and 1919, as well as the interest upon the whole indebtedness at 10 per cent up to October 27th, 1919, were paid. On November 15th, 1919, this court affirmed the judgment of conviction rendered in the trial court. See State v. Lehman, 44 N. D. 572, 175 N. W. 736. Later, Adolph became an inmate of the state penitentiary to serve his sentence. Subsequently, while a trusty, he escaped. His whereabouts, of course, are unknown. In 1920 the wife remained upon the farm. In 1921, it was in the possession of the wife's tenant. Poor crops upon the farm resulted in 1919. No payments have been made upon the principal of the notes due since 1919 excepting two items amounting to $162.50. In June, 1921, this action of foreclosure was instituted.

An answer in behalf of Adolph and his wife was interposed which alleges that the notes and mortgages were given pursuant to an agreement to loan them $24,430 with interest at 10 per cent, of which they had received only $14,430; that plaintiff retained $10,000 as interest; that defendants are entitled to be relieved upon payment of $14,300 to plaintiff; that such agreement, furthermore, was executed for such amount, $24,430 with interest at 10 per cent, in order to secure plaintiff against any loss upon the bail bond and with the understanding that when defendants had paid $14,430 with interest at 10 per cent plaintiff would satisfy the mortgages and debt. Otherwise, the answer alleges relations of trust existing between the parties and fraud, duress, and

undue influence by plaintiff upon Adolph by reason of his arrest, conviction, and the necessity of having a bail bond. As a counterclaim the answer further demands double the amount of excess payments upon the ground that the transaction was usurious. Trial was had in the lower court in December, 1921.

Pursuant to the testimony of Adolph's wife, when the notes and mortgage were executed plaintiff agreed to satisfy the mortgage and debt upon payment of $14,430; that pursuant to an oral agreement, Adolph possessed the right to repurchase the personal property at the same price plaintiff paid therefor after allowing plaintiff 10 per cent interest on his money and $50 per month while he remained on the place. That, in addition, there was the agreement that plaintiff should assume the mortgage given to Adolph's counsel and the mortgage on the land for $1,200; and that Adolph should pay for the threshing outfit $2,000.

There was also testimony to the effect that this deal was thus made to protect plaintiff upon the bail bond and Adolph against the greed of his counsel.

Pursuant to the testimony of Adolph's brother, who had signed his bond, plaintiff told him that he had it fixed so that the lawyers could not get any more money from Adolph; that plaintiff, out of the personal property purchased, sold cattle, calves, and wool from the sheep receiving therefor substantial amounts.

Pursuant to the testimony of Adolph's father, when the personal property was sold by Adolph to plaintiff, plaintiff told Adolph he could buy the property back at the same price plaintiff paid for it; that if plaintiff sold any of the property it would, accordingly, lessen the price therefor; that plaintiff further told him that the mortgage was for about $14,000; that when Adolph paid that amount he would remit the $10,000.

Another witness testified to the effect that the plaintiff told him that Adolph had given him a note for $10,000 additional so that Adolph's counsel could not get everything Adolph had.

Pursuant to the testimony of plaintiff, he bought this personal property only after inspection and consideration; it was a good deal. He had sold his farm and was planning on going away. He cropped the land in 1917 and secured only 92 bushels of wheat; when Adolph came there after the trial, he was not anxious to sell, but Adolph was so anx-

ious to buy that he finally made a contract with him. Then, the land was all prepared and, through a rising market, prices had accordingly increased; he made out an inventory of the property which figured up in the aggregate $17,233. It was before them in the negotiations. Then, Adolph desired also to purchase the threshing machine. Finally, they agreed on a total consideration of $19,000. The agreement to assume the mortgage given to Adolph's counsel and the mortgage on the land were additional items. On the agreed date, March 30th, 1918, they went to the bank and there the itemized account was present and a statement then was had including additional items such as taxes paid, cash loan to Adolph, interest paid, and other expense items which made up the total amount, $24,430. These items were all written down there in the bank by one Kern in the presence of plaintiff and Adolph and they were then added up on an adding machine and the amount determined.

The assistant cashier of the bank testified that he made out the papers; they advised him what they desired, he wrote it down and then typed the papers. He did not hear any conversation in regard to the notes and mortgages.

When the testimony was closed in December, 1921, plaintiff stated that he wanted to take the deposition of Kern. Later, on March 23d, 1922, he served upon defendant's counsel notice for the taking of the deposition of Kern in Los Angeles, California.

The trial judge in his memorandum opinion states that this deposition was taken upon the suggestion of the court. The record does not disclose any court order in that regard. Upon motion made, he refused to suppress the deposition although he offered to defendants the right to cross-examine Kern at some subsequent hearing. The trial court made findings to the effect that there was no fraud, undue influence, or misrepresentation in securing the execution of the notes and mortgages; that no usurious interest was retained or agreed to be retained by plaintiff; that defendants, Adolph and his wife, executed such notes with full knowledge of their contents and that such notes represented the amount due plaintiff on March 30th, 1918. Judgment of foreclosure was accordingly ordered for $19,633.04, costs included.

## Decision.

The defendants maintain that the deposition of Kern should have been suppressed. The manner in which this deposition was taken, assuredly, was irregular and improper. After trial and submission of briefs, it conduces neither to orderly procedure nor judicial expedition, to permit one party, upon his own initiative and notice, to cause a deposition to be taken without order of court or consent of opposing counsel. The purpose of the statute requiring depositions, taken upon notice, to be made and returned before the trial, is clear, Comp. Laws, 1913, § 7905. In the instant case, however, the deposition of Kern afforded simply cumulative evidence. The action is in equity and triable de novo. For purposes of considerations given herein, this deposition may be disregarded.

The defense is grounded upon an oral agreement for resale made at the time of the original sale by Adolph in 1917 and, upon an oral agreement, accompanied by fraud and undue influence at the time of the resale in 1918 to Adolph, to the effect that upon payment of $14,300 and interest thereon, plaintiff would satisfy the debt and mortgages. Upon these oral agreements usury is predicated. The defendant is seeking equitable interposition to enforce these oral agreements. The questions presented are largely questions of fact. No extended discussion of the evidence is deemed necessary. The record has been fully considered.

Were these oral agreements made? If made, do the circumstances invoke principles of equity so as to require their enforcement? It may be noted that the defendants seek to revise, not to cancel, the contract of sale; to have the true consideration ascertained and to enforce that consideration alone.

The trial court found that these alleged oral agreements were not made. At the time of the original sale, plaintiff and Adolph evidenced the sale by a written contract. It is not sought to set aside this written contract. At the same time, a written lease of Adolph's land was given. The validity of this lease is not questioned. Prior to this time Adolph had given to his counsel a mortgage upon this land. Plaintiff had not yet become a bondsman. The evidence is insufficient to establish that these written instruments were given for purposes of security or to

evidence a loan. When Adolph was admitted to bail, plaintiff and Adolph's brother, his bondsman, received the mortgage for $20,000 to secure them. After Adolph's conviction and appeal to this court his bondsmen, again for the new bond, received security by a similar mortgage. Thus, plaintiff, his bondsmen, received security. When the resale was made, a written agreement was again made between plaintiff and Adolph expressing a consideration of $24,000 which included the assumption and payment of certain mortgages by plaintiff. This agreement was dated March 25th, 1918. Later, on March 30th, 1918, the notes and mortgages, now questioned, were executed by Adolph and his recent wife in fulfilment of the prior agreement. Now it is claimed that the real consideration for this resale was only $14,300 and that an oral agreement was made to satisfy the mortgages and return the notes when this real consideration was paid. Further; that the price so fixed upon the resale was so grossly disproportionate to the original sale price as to corroborate the testimony of the witnesses concerning these oral agreements and to establish, under the circumstances existing, fraud, duress, undue influence, and abuse of confidential relations. Plaintiff demanded upon a resale, $19,000 for his personalty and the cancelation of Adolph's lease. He made an itemized statement of the property and his price therefor. The existence of this statement at the time of the negotiations between plaintiff and Adolph on March 25th, 1918, is not disproved. This statement indeed shows high values placed upon property that he purchased from Adolph for $9,000, but it included seed wheat, seed flax, seed potatoes, and hay and wheat on hand, presumably, not included in the original bill of sale. It also included $1,500 for the cancelation of a lease and also a threshing machine. When the notes and mortgages were executed this $19,000 sale statement was supplemented by another statement including the mortgages to be assumed by plaintiff, a cash loan, and other items whereby the amount of $24,430 was determined.

The contract was harsh, even improvident. But, is the evidence sufficient to establish that the true consideration was $14,430 and sufficient to overturn the written contract of the parties? We are not prepared to so hold or that the findings of the trial court should be reversed. This record involves a family affair. Adolph complains that the plaintiff, his brother-in-law, imposed upon him at a time when he was helpless

49 N. D.—47.

and was compelled to comply with his wishes; yet, Adolph, after his conviction of murder, had no hesitancy in entering the marriage state, in engaging in business like any other free citizen, and in contemplating an evasion of the penalty of his crime through law delays for a period of some two years. While thus free, Adolph, upon the record of his payments and his conduct, did not seek to question this contract or the amount thereof. Later, his wife, while in possession, personally or through a tenant, did not seek to question this contract. When his appeal in his criminal case came to this court it was placed promptly upon the calendar, heard and determined within one month after filing of briefs and argument. After his incarceration to serve his sentence and while a trusty, he escaped and since has been at large.

By proxy, he is before this court again, now seeking the interposition of equity to aid him; whilst he in person, somewhere in hiding, evades the mandate of this court, jests at the majesty of the law, and refuses to conform to its sanction. The property involved was Adolph's property. The wife is concerned to the extent of her personal liability upon the notes. There was no homestead existing when the mortgages were executed. Neither Adolph nor his wife was then living on the land. Upon the record, the wife is in no position stronger than that of her husband. Disregarding the evidence contained in the deposition, we are satisfied that the evidence is insufficient to set aside the written agreements of the parties, to establish fraud, duress, or undue influence, or to characterize the agreements of the parties as a loan transaction. The judgment is affirmed with costs.

CHRISTIANSON and JOHNSON, JJ., and BURR, Dist. J., concur.

BIRDZELL, J. (dissenting). As I view this case it presents a single issue of fact, namely, what was the consideration for the mortgages and notes given by Adolph and Lillian Lehmann to the plaintiff in this action? I am aware that the consideration is stated not only in the mortgages, but in memoranda that were made at the time of the negotiations, and I agree that this statement of the consideration should not be considered as legally impeached unless the evidence is of a satisfactory character. In a case where the evidence of witnesses is conflicting, and where the trial court has had the superior opportunity to weigh their

testimony, the appellate court should be reluctant to disturb the findings. However, this being a trial de novo, it is the duty of this court on appeal to retry the issues on the record as best it can in the light of the foregoing considerations.

It seems to me that there are a number of circumstances to be considered in weighing the evidence in this case to which there has not been attributed the weight which would ordinarily attach to their existence. Among these circumstances may be mentioned the following: Within two days after Adolph Lehmann's crime was committed, he gave a mortgage to his attorney for $3,500, and within three weeks of that same date, through negotiations conducted partly by the same attorney, he had realized in cash $9,000 for personalty sold to his brother-in-law Bahnemann, and $500 for a lease upon the land which carried with it a growing crop of more than 200 acres, all of this money being deposited in a bank to the credit of the same attorney. The record shows that this was a fair approximation of the value of the property purchased. There is testimony to the effect that at the time the sale contract was made it was agreed that Adolph might repurchase at the same figure, plus interest and compensation for care of the property. In the nine months intervening the original sale and the resale, the plaintiff had realized about $2,500 from the property sold. When the resale was agreed upon the valuation of all items was approximately double that at which they had been purchased by Bahnemann a short while before. Witnesses testified to the effect that Bahnemann admitted the valuation did not represent the real amount Lehmann was obliged to pay; that it was $10,000 in excess of his real obligation and that the amount was placed high to protect him against the further rapacity of lawyers. Whether or not this reflection on the profession or upon any particular counsel is warranted is wholly beside the issue here, but, taken in connection with the promptness with which counsel apparently had been paid $13,000 before the trial of the defendant in this action, it would appear that there were grounds for apprehension in the Lehmann family, and it is only reasonable to expect that they would have contemplated some preventative measures of this character. Another circumstance is the uncertainty of Adolph being permitted to remain upon the farm long enough to successfully carry the heavy burden that he was assuming. Whatever abandon he might have manifested by his rash

criminal act, this record abounds with evidence, largely circumstantial in character, of his business ability and thrift. Though being approximately thirty-one years of age, he held in his own right 800 acres of land almost clear and personal property valued conservatively at $9,000 to $10,000. Furthermore, the business ability manifested in the making of the large payments after the repurchase contract is not to be ignored. Altogether it seems highly improbable that such an improvident contract would have been made. The explanation, in accordance with the admissions testified to by the various witnesses, seems to me to give a much more reasonable account of the stated consideration than the testimony of Bahnemann in support of his exaggerated valuations. Furthermore, it may be remarked here that if such be the proper explanation, it is not likely it would have been discussed with the assistant cashier of the bank who made out the papers. The valuation of the property moreover, appearing in the memoranda, is a lump valuation. The property is not itemized nor appraised save in Bahnemann's own book.

Evidence to establish that the true consideration for a contract is other than the consideration stated in the agreement itself, does not need to be as strong as that required to establish fraud, duress, undue influence or unfair dealing; because, as is commonly known, a false consideration is frequently stated between parties to a transaction when neither has any fraudulent purpose in mind with respect to the other and when such false consideration is entirely consistent with fair dealing.

Taking into account all the circumstances disclosed on this record and weighing the testimony in the light of the situation of the parties, I am of the opinion that it satisfactorily establishes that the notes and mortgages to the extent of $10,000 were not based upon any consideration; that the contract between the parties was one whereby the property involved was sold by Bahnemann to Lehmann at substantially what Bahnemann had paid for it, which, together with indebtedness assumed by Bahnemann, made up the total of $14,430. The plaintiff should be permitted to foreclose for this amount, crediting the defendant with the payments actually made.